377 F.Supp. 1041 (1974)
FIRST NATIONAL BANK OF SIKESTON, Plaintiff,
v.
TRANSAMERICA INSURANCE COMPANY, Defendant and Third-Party Plaintiff,
v.
Donald R. BOHANNON, Third-Party Defendant.
No. S 73 C 14.
United States District Court, E. D. Missouri, Southeastern Division.
May 30, 1974.
Bernard C. Rice, Blanton, Blanton, Rice & Sickal, Sikeston, Mo., Ward & Reeves, Caruthersville, Mo., for plaintiff.
Veryl L. Riddle and Thomas C. Walsh, St. Louis, Mo., for Transamerica Ins. Co.
Albert E. Schoenbeck, St. Louis, Mo., and Weber Gilmore, Sikeston, Mo., for third party defendant Bohannon.

*1042 FINDINGS OF FACT AND CONCLUSIONS OF LAW
MEREDITH, Chief Judge.
This cause was tried to the Court. The Court makes the following findings of fact and conclusions of law:

Findings of Fact
1. The plaintiff is a national bank, with its principal place of business in Sikeston, Missouri. The defendant is a foreign corporation, with its principal place of business in Los Angeles, California, and engaged in business in the State of Missouri.
2. Transamerica Insurance Company issued a bankers' blanket bond, numbered XXXX-XX-XX, to the First National Bank of Sikeston, which protected the bank from dishonest or fraudulent acts of any employee at all times in issue. The bond states that:
"`Employee' means one or more of the Insured's officers, clerks and other employees while employed in, at or by any of the Insured's offices while covered under this bond . . ."
"THIS BOND DOES NOT COVER:
"(d) loss resulting from any act or acts of any director of the Insured other than one employed as a salaried, pensioned or elected official or an Employee of the Insured, except when performing acts coming within the scope of the usual duties of an Employee, or while acting as a member of any committee duly elected or appointed by resolution of the board of directors of the Insured to perform specific, as distinguished from general, directorial acts on behalf of the insured."
3. Defendant has filed a third-party complaint against Donald R. Bohannon for whatever amount plaintiff may recover against it.
4. Donald Bohannon was president of plaintiff from 1966 until January 1971. In February 1969, Bohannon had acquired a one-third interest in Gibson Livestock Company, of Marion, Kentucky, and was an officer of that company.
5. At all times pertinent hereto Gibson Livestock Company maintained one or more accounts in Providence State Bank and in First National Bank of Sikeston.
6. Bank examiners in 1969 advised First National that it should discontinue allowing Gibson Livestock immediate credit on uncollected drafts, because the volume of the drafts exceeded the bank's loan limit of $150,000. In some instances, immediate credit had been given for $300,000 to $500,000 on uncollected funds. First National had made a profit on the Gibson Livestock account, but uncollected drafts were no longer given immediate credit.
7. In May 1970, the Regional Controller of Currency criticised the revised Gibson Livestock account at First National, and criticised Bohannon's ownership of Gibson Livestock, and advised Bohannon that he had a conflict of interest and should resign. Thereafter, the account was closed by order of the Board of Directors of First National. (In January or February 1971, at Bohannon's request and assurance that it would be handled on a cash basis only, the Gibson Livestock account was reopened.)
8. Gibson Livestock needed cash funds to pay for its cattle purchases, and in order to raise the funds to pay for its cattle purchases, resold the said cattle, and Bohannon drew drafts upon its purchaser and obtained immediate bank credit on the draft before collection, and these funds were used to pay for the cattle purchases. The practical effect of the arrangement was that Gibson Livestock paid for its cattle purchases out of uncollected funds created by the deposit of drafts drawn on the purchasers of the same cattle.
9. In order to allow time for the bank funds to become available for the payment of its cattle purchases, Bohannon devised and arranged for a three-way banking arrangement between *1043 Providence State Bank, First National Bank, and Union Planters.
10. In the latter part of December 1970, Donald Bohannon, president of First National Bank of Sikeston, Missouri, and Thomas Gibson, president of Gibson Livestock Company, met with David Sutherland, president of Providence State Bank, in the offices of the Bank of Providence in Kentucky. Bohannon, president of First National Bank of Sikeston, advised Sutherland that he was in the process of arranging for a one-half million dollar line of credit at Union Planters Bank in Memphis, Tennessee, so that checks deposited by Gibson Livestock Company to its accounts at Providence State Bank, drawn on the Gibson Livestock Company account at the First National Bank of Sikeston, could safely be given immediate credit by Providence State Bank. Bohannon would keep track of and control the handling of the funds on this basis. At this meeting, Bohannon, president of the First National Bank of Sikeston, assured David Sutherland, as president of the State Bank of Providence, that all checks drawn on the Gibson Livestock account in the First National Bank of Sikeston would be paid. At all times in issue, Bohannon owned one-third of the capital stock of Gibson Livestock Company and was an officer and director thereof.
11. Relying upon the representations, assurances, and actions of Bohannon as president of First National Bank of Sikeston, the Bank of Providence agreed to the arrangement and began to allow immediate credit on all checks drawn on the Gibson Livestock account with the First National Bank of Sikeston and deposited in the Gibson Livestock account in the State Bank of Providence.
12. Bohannon, as president of First National Bank of Sikeston, or as chairman of the board of First National Bank of Sikeston, opened an account for Gibson Livestock Company in the Union Planters National Bank of Memphis, Tennessee, and the arrangements were made with John Hembree, vice president of the bank. The account was opened in order that Gibson Livestock Company could deposit checks and drafts and Union Planters National Bank could give immediate credit for these deposits, and there were no restrictions and sizeable amounts of money would be handled. The account was commenced February 8, 1971, and was closed June 28, 1971. Most of the debits to the Union Planters account were by debit memorandum, which meant transferring money from Union Planters National Bank to the First National Bank of Sikeston for the credit of Gibson Livestock Company, and this was generally done by telephone. The only person authorized to sign checks on the account of Gibson Livestock Company in Union Planters National Bank was Donald R. Bohannon.
13. Under this arrangement Gibson Livestock would issue checks on its account at Providence State Bank. In order to have bank funds available to pay these checks, Gibson Livestock would write a check payable to its own order, drawn on First National, and deposit it in Providence State Bank, and immediate credit was given, pursuant to the verbal assurances of Bohannon that First National would pay these checks. Some four or five days later, through normal banking channels, the checks deposited at Providence were presented at First National for payment, and Bohannon would determine daily the amount of funds required to pay these checks and would daily transfer by telephone or by wire funds from Gibson Livestock account at Union Planters. Bohannon obtained the funds deposited at Union Planters by drawing drafts on cattle purchasers and obtaining immediate credit on the uncollected drafts at Union Planters.
14. Bohannon used the encoding machine of First National Bank to encode drafts so that the drafts could be handled as cash items and collected through regular banking channels. This had the effect of slowing collection on the drafts.
*1044 15. In December 1970 or January 1971, Bohannon tendered his resignation to plaintiff in order to concentrate on his other interests, including Gibson Livestock.
16. Bohannon remained on the Board of Directors and was a member of the Discount Committee until June 1971, attending meetings and passing on the advisability of extensions of credit, for which he was paid a fee.
17. From February 8 until approximately April 1, 1971, the drafting arrangement worked without incident.
18. The monthly statements received by Bohannon from Union Planters revealed the following information as to the volume in that account:

 No. of
 Total Credits Total Debits Transactions
February 1,053,627.07 1,033,000.00 25
March 2,080,005.90 2,065,330.25 53
April 3,677,579.56 3,384,826.96 77

19. On April 29th, Bohannon, without prior notice to First National and Providence Bank advised First National about 3:00 p. m. that he did not have any money in Union Planters to transfer to cover the checks First National had received that day.
20. On April 30th, these checks were mailed in the regular United States mail at Sikeston, Missouri, addressed to Federal Reserve Bank in St. Louis.
21. At no time was Providence State Bank advised of First National Bank's decision not to honor any of the checks, nor was notice of dishonor of any of the twenty-three checks given to Federal Reserve Bank by First National Bank of Sikeston by telephone, wire, cable, or in any other manner.
22. Bohannon's statement to First National Bank of Sikeston was false in that there was on deposit in the Union Planters Bank to the account of Gibson Livestock Company at all times, funds which, if transferred in accordance with the agreement between David Sutherland as president of the Providence State Bank to First National Bank of Sikeston, would have been sufficient to pay all of the checks. On May 3, 1971, there was on deposit at Union Planters $497,939.70. After May 3rd, said funds were applied, at the direction of Don Bohannon, to other purposes, including payment of $80,000 to principals of Gibson Livestock Company and close business associates of First National Bank of Sikeston.
23. On July 20, 1971, Providence filed suit in this Court against First National Bank of Sikeston, Cause No. S 71 C 60. Transamerica Insurance was given notice and tendered the defense of the lawsuit, but refused to defend, since it decided that even if Providence won its claim, it would not constitute a loss under the bond.
24. The case had already been set for trial at the May 1972 term, but First National Bank, almost nine months after the institution of the lawsuit, again renewed its demand that Transamerica defend the action.
25. After some last minute discovery, the Providence lawsuit was tried before Judge Webster in Cape Girardeau, on May 26, 1972. Both parties stipulated that all pleadings, depositions, and other discovery could be made a part of the record without objection. First National Bank put on no live witnesses and made no objection to the evidence offered by Providence. At the conclusion of the evidence, Judge Webster asked for proposed findings and conclusions from each party.
26. Following the June 15th meeting, plaintiff's revised proposed findings and conclusions were submitted to Judge Webster, and the previous ones were withdrawn. After a conference with attorneys for both sides, the Court, on June 27th, entered its findings of fact and conclusions of law, holding First National Bank liable to Providence in the amount of $100,174.22. In the course of its findings, the Court held that "at no time was Providence State Bank advised of defendant bank's decision *1045 not to honor any of the checks, nor was notice of dishonor of any of the 23 checks given to Federal Reserve Bank by First National Bank of Sikeston by telephone, wire, cable or in any other manner." This finding was, in effect, stipulated to by the parties.
27. The Court also found that in late December 1970, Bohannon met with David Sutherland, president of Providence, and advised that he was in the process of arranging for a one-half million dollar line of credit at Union Planters Bank in Memphis. The Court also found that Bohannon had assured Sutherland that all checks drawn on the Gibson account at First National Bank would be paid. The Court did not find either of those statements to be false. It held, however, that First National Bank had failed to give the requisite statutory notice of its intent not to pay these checks and imposed liability under the U.C.C., as applied in Central Bank & Trust Co. v. First Northwest Bank, 332 F.Supp. 1166 (E.D.Mo.1971), affirmed per curiam, 458 F.2d 511 (8th Cir. 1972). Judge Webster then addressed himself to the "affirmative defenses" raised by First National Bank and dismissed them:
". . . because of the bad faith imputed to defendant bank by the fraudulent misrepresentations of its President, Don Bohannon, intended to be and relied upon by plaintiff bank to its detriment, in representing to plaintiff that security or services of a board member of defendant bank had been supplied or furnished by such board members to Gibson Livestock Company in arranging for the account at Union Planters National Bank when in fact no security or services were so furnished; and further because of the fraudulent conduct of Bohannon after checks had been returned insufficient funds, in arranging for $80,000 of funds intended to be used to pay checks drawn on Gibson Livestock Company's account with plaintiff to be paid $40,000 to a trust created by such board member and $40,000 to Gibson Livestock Company in which Bohannon held a one-third interest."
28. Judgment was entered for Providence State Bank in accordance with the Court's findings, and First National Bank demanded payment by Transamerica of the judgment, plus costs and attorney's fees expended in said suit. When Transamerica refused, this suit was filed to recover the judgment paid by First National to Providence, plus costs and attorney's fees paid in defending S 71 C 60.
29. Shortly after the complaint in this action was filed, plaintiff filed a motion for summary judgment, claiming that it was entitled to recover because Transamerica had been invited to defend the earlier action, had declined, and, therefore, was irrevocably bound by the findings, conclusions, and judgment in the earlier case. After a hearing, however, Judge Webster rejected First National Bank's contentions. He did not determine whether Transamerica had a duty to defend the earlier case, but he did hold that, in any event, his findings of fraudulent misrepresentations contained in No. S 71 C 60 were unnecessary in that First National Bank became liable to the Providence State Bank when it failed to return the checks in issue. Under the approved rationale of Central Bank & Trust Co. v. First Northwest Bank, supra, the so-called "affirmative defenses" of First National Bank to Providence's claim were insufficient as a matter of law, and, therefore, there was no need to discuss whether First National Bank was estopped from asserting them.
30. Plaintiff paid in S 71 C 60 a total of $120,359.04, which consisted of the judgment of $100,174.22, attorney's fees of $19,601.42, and costs of $583.40.

Conclusions of Law
1. This Court has jurisdiction of this action because of diversity of citizenship *1046 and the amount in controversy exceeds $10,000.
2. In case No. S 71 C 60, plaintiff First National Bank sustained a loss of $120,359.04 for failure to give the statutory notice of its intent not to pay these checks. This failure and loss directly resulted from the fraudulent misrepresentations and actions of Donald R. Bohannon in connection with the Gibson Livestock Company account.
3. Donald R. Bohannon was an employee of First National Bank of Sikeston at all pertinent times. Donald R. Bohannon was president of the First National Bank of Sikeston until January 1971, an assistant to the president until February 1971, and on the Discount Committee of the Board of Directors at a fee of $100.00 a month until June 1971.
4. The loss is within the coverage of the defendant's bond and defendant Transamerica is liable to plaintiff for the sum of $120,359.04, together with interest from July 12, the date of demand upon defendant for the payment of the judgment entered in S 71 C 60, and its costs and attorney's fees.
5. The fact that Bohannon's relationship with Gibson Livestock Company may have been known earlier to the insured does not bar recovery under the bond, since "the true nature" of the events that gave rise to the plaintiff's loss were not known, General Finance Corp. v. Fidelity & Cas. Co. of N. Y., 439 F.2d 981, 987 (8th Cir. 1971).
6. The evidence in this case is totally insufficient to show collusion in the prior judgment.
7. Transamerica is entitled to recovery against third-party defendant Donald R. Bohannon in the full amount of this judgment.
8. There will be no damages awarded for vexatious delay or attorney's fees in the trial of this case.